ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE,

        Plaintiff,

  v.

ELDER CREEK TRANSFER & RECOVERY,
INC.,

        Defendant.

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387)**

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its

counsel, hereby alleges:

## I.    __JURISDICTION AND VENUE__

      1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal

Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the

Act") against Elder Creek Transfer & Recovery, Inc. ("Defendant").  This Court has subject matter

jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act,

33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen

suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C.

§1365(a) (injunctive relief), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue

declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.     On July 23, 2019, Plaintiff provided written notice to Defendant, via certified mail, of Defendant's violations of the Act ("Notice Letter"), and of its intention to file suit against Defendant, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1).  Plaintiff mailed a copy of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1).  A true and correct copy the Notice Letter is attached hereto as **Exhibit A**, and is incorporated by reference.

3.     More than sixty days have passed since Plaintiff served the Notice Letter on Defendant and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is proper in Sacramento, California, because the sources of the violations are located within Sacramento County.

## II.     INTRODUCTION

5.     This Complaint seeks relief for Defendant's violations of the CWA at the approximately 19.26-acre transfer station located at 8642 Elder Creek Road, in Sacramento, California ("the Facility").  Defendant discharges pollutant-contaminated storm water from the Facility into the City of Sacramento's storm water drainage system, which then discharges to Morrison Creek, which discharges to the Sacramento River, and the Sacramento-San Joaquin Delta ("Impacted Waters").  The Impacted Waters are waters of the United States within the meaning of the Clean Water Act.  Defendant is in violation of both the substantive and procedural requirements of the CWA.

6.      Defendant's discharges of pollutant-contaminated storm water from the Facility violate Section 301 of the Act, which prohibits the discharge of storm water associated with industrial activities to waters of the United States except in compliance with the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. These violations are ongoing and continuous.

7.      Defendant's discharges of pollutant-contaminated storm water from the Facility violate the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ, and Water Quality Order No. 14-0057-DWQ, NPDES General Permit No. CAS000001 (hereinafter "General Permit" or "Permit"). Defendant's violations of the permitting, filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

8.      The failure on the part of industrial facility operators, such as Defendant, to apply for and comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Sacramento River, and the Sacramento-San Joaquin Delta. The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the aquatic environment each year. With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to the Impacted Waters.

III.    **PARTIES**

9.      Defendant Elder Creek Transfer & Recovery, Inc. is a California corporation.

10.     Defendant Elder Creek Transfer & Recovery, Inc. owns and operates the Facility.

11.     Plaintiff CSPA is a non-profit public benefit corporation organized under the laws of California, with its main offices in Stockton, California. CSPA is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California waters, including the waters into which Defendant discharges pollutant contaminated storm water. To further its

goals, CSPA actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

12.     Members of CSPA, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on and near the Impacted Waters, into which Defendant causes pollutants to be discharged.  These members of CSPA use and enjoy the Impacted Waters for recreational, educational, scientific, conservation, aesthetic and spiritual purposes.  Defendant's discharges of storm water containing pollutants impairs each of those uses.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the General Permit.

13.     Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the Impacted Waters, into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use these areas to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities because that relief will significantly reduce pollution discharged from Defendant's Facility into the Impacted Waters.

14.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act

15.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA establishes an "interim

goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and a technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

16.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits both discharges not in conformance with an NPDES permit, such as discharges without an NPDES permit issued pursuant to Section 402 of the Act (33 U.S.C. §1342) or discharges that violate the terms of an NPDES permit.

17.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

18.     A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

19.     "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7). Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015).  Section 402 of the Act, 33 U.S.C. § 1342, establishes the NPDES program, a permitting program that regulates the discharge of pollutants into waters of the United States.  Section 402(p) establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  33 U.S.C. § 1342(p)(2)(B).  Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges, through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

Complaint for Declaratory and Injunctive Relief and Civil Penalties

20.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); 33 U.S.C. § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

21.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009 and $54,833 per day per violation for all violations that occurred after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act.  33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4.

**B.     State Regulations**

22.     The Act requires States to promulgate water quality standards.  *See* 33 U.S.C. §§ 1313(a)-(c).  Water quality standards consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses.  33 U.S.C. § 1313(c)(2)(A).  The Act requires States to assess whether these water quality standards are being met.

23.     The Sacramento River is heavily degraded from pollutant loading.  This is officially recognized by the EPA, the State Board, and the Regional Board, which has placed the waterbody on the CWA section 303(d) list of waters that are so polluted that they do not meet applicable water quality standards.  The Regional Board's Water Quality Control Plan for the Central Valley Region (hereafter referred to as the "Basin Plan") is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for preventing the impairment of water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH,

Complaint for Declaratory and Injunctive Relief and Civil Penalties

dissolved oxygen and toxic pollutants.

**C.      California's General Permit for Storm Water Associated with Industrial Activities**

24.      Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits in California, including general NPDES permits.

25.      The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

26.      Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

27.      Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

28.      In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

29.      The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

30.      Discharge Prohibition III.B of the General Permit prohibits discharges of liquids or materials other than storm water, either directly or indirectly to waters of the United States unless authorized by another NPDES permit or as authorized in Section IV of the General Permit.

31.      Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or

nuisance as defined in section 13050 of the California Water Code.

32.     Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.

33.     Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

34.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

35.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids ("TSS") – 100 mg/L; Oil & Grease ("O&G") – 15.0 mg/L; Iron ("Fe") – 1.0 mg/L; Aluminum ("Al") – 0.75 mg/L; Lead ("Pb") – 0.262 mg/L; Zinc ("Zn") – 0.26 mg/L; Copper ("Cu") – 0.0332 mg/L; and, Chemical Oxygen Demand ("COD") – 120 mg/L.

36.     The Regional Board has established water quality standards for the Impacted Waters in the Basin Plan.

37. The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."  Water Quality Control Plan for the California Regional Water Quality Control Board, Central Valley Region, Fifth Edition, Revised May 2018 ("Basin Plan"), 3.1.20.

38. The Basin Plan provides that "[w]ater designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and WATER

QUALITY OBJECTIVES 3-4 May 2018 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449..” Basin Plan, 3.1.3.

39. The General Permit requires dischargers to develop and implement a site-specific SWPPP. General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and, (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

40. Dischargers subject to the General Permit must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions. General Permit, Section X.B.

41. Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit. In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice. General Permit, Section X.H.2.

42. Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI. The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. General Permit, Section XX.B.

43. Section XV of the General Permit requires an annual evaluation of storm water controls

1   including the preparation of an evaluation report and implementation of any additional measures in the

2   SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual

3   evaluation.

4        44.    The General Permit requires dischargers to eliminate all non-storm water discharges to

5   storm water conveyance systems other than those specifically set forth in Section IV of the General

6   Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

7        45.    The General Permit requires dischargers to implement a Monitoring Implementation

8   Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm

9   water discharge locations.  General Permit, Section X.I.2.  Dischargers must then conduct monthly

10  visual observations of each drainage area, as well as visual observations during discharge sampling

11  events.  General Permit, Section XI.A.1 and 2.  Dischargers must also collect and analyze storm water

12  samples from two (2) storm events within the first half of each reporting year (July 1 to December 31)

13  and two (2) storm events during the second half of each reporting year (January 1 to June 30).  General

14  Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season

15  for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain

16  industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the

17  facility based on the pollutant source assessment.  General Permit, Section XI.B.6.

18       46.    Dischargers must submit all sampling and analytical results via SMARTS within thirty

19  (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results must be

20  compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General

21  Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the

22  results for a parameter for all samples taken within a reporting year exceeds the annual NAL value.

23  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more

24  results from samples taken for any single parameter within a reporting year exceed the instantaneous

25  maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL exceedance during

26  a reporting year, the discharger's status changes to Level 1 status under the General Permit and the

27  discharger must comply with the requirements set forth for Level 1 status operators set forth at Section

28

1    XII.C.  The discharger's status shall change to Level 2 status if sampling results indicated an NAL

2    exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2

3    status it must comply with the obligations set forth at Section XII.D of the General Permit.

4          47.    Dischargers must submit an Annual Report via SMARTS no later than July 15th

5    following each reporting year, certifying compliance with the General Permit and/or an explanation for

6    any non-compliance.  General Permit, Section XVI.

7    **V.    STATEMENT OF FACTS**

8          48.    The Facility is an approximately 19.26-acre solid waste transfer and recovery station.  A

9    site map of the Facility is attached as **Exhibit B**.  Defendant's primary industrial activities at the Facility

10   include accepting, sorting, recycling and disposing of public and commercial solid waste.  Most of these

11   industrial activities occur outside in areas that are exposed to storm water and storm flows due to the

12   lack of overhead coverage, functional berms, and other storm water controls.

13          49. The primary industrial activities at the Facility fall under Standard Industrial Classification

14   ("SIC") Codes 5093 ("Scrap and Waste Materials"), 4212 ("Local Trucking Without Storage"), and

15   4953 ("Landfills and Land Application Facilities").

16          50. Defendant collects and discharges storm water associated with industrial activities at the

17   Facility through at least four discharge points into the City of Sacramento storm water drainage system,

18   from which the water flows to Morrison Creek, into the Sacramento River and the Sacramento-San

19   Joaquin River Delta.  The Delta and its tributaries are waters of the United States within the meaning of

20   the Clean Water Act.

21          51. Defendant filed a Notice of Intent to comply with the General Permit on or about June 20,

22   2001, and updated it most recently on January 24, 2019.  The Facility's Waste Discharge Identification

23   ("WDID") number is 5S34I016593.

24          52. On or about July 1, 2015, Defendant uploaded to the Storm Water Multiple Application &

25   Report Tracking System ("SMARTS") a SWPPP, certified on June 30, 2015.

26          53. Defendant uploaded an uncertified, amended SWPPP to SMARTS on or about December 31,

27   2018.

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties

1      54. On or about July 12, 2019 and again on September 16, 2019, Defendant uploaded to

2  SMARTS uncertified amendments to the December 31, 2018 SWPPP.

3      55. Under the General Permit, Defendant has sampled storm water discharges from the Facility

4  and found levels of pollutants in the samples that exceeded on various occasions the EPA's benchmarks

5  and the General Permit's Numeric Action Levels ("NALs").  This information was reported to the

6  Regional Board, as required by the General Permit.

7      56. According to Defendant's self-monitoring reports submitted to the Regional Board,

8  Defendant has measured discharges containing levels of TSS, O&G, Cu, Fe, Al, Zn, and COD in excess

9  of the EPA Benchmark Values and NALs on at least fifty-nine (59) occasions since July 23, 2014.

10      57. Self-monitoring reports filed pursuant to an NPDES permit that report exceedances of permit

11  limitations constitute "conclusive evidence" of violations of the permit and the Act.  *Sierra Club v.*

12  *Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *rev'd on other grounds*, 485 U.S. 931, *amended by* 853

13  F.2d 667.

14      58. Plaintiff is informed and believes, and thereupon alleges, that since at least July 23, 2014,

15  Defendant has consistently discharged storm water and non-storm water containing impermissible levels

16  of TSS, O&G, Cu, Fe, Al, Zn, COD, and other pollutants associated with Defendant's industrial

17  operations into the Impacted Waters, without complying with the terms of the General Permit.

18      59. According to Defendant's self-monitoring reports, since at least July 23, 2014, Defendant has

19  known that storm water discharged from the Facility contains concentrations of: TSS in excess of EPA

20  Benchmark Value of 100 mg/L; O&G in excess of EPA Benchmark Value of 15 mg/L; Fe in excess of

21  EPA Benchmark Value of 1.0 mg/L; Al in excess of EPA Benchmark Value of 0.75 mg/L; Zn in excess

22  of EPA Benchmark Value of 0.26 mg/L; Cu in excess of EPA Benchmark Value of 0.0332 mg/L; and,

23  COD in excess of EPA Benchmark Value of 120 mg/L.

24      60. On at least six (6) documented occasions since July 23, 2014, the levels of TSS detected by

25  Defendant in the storm water discharged from the Facility exceeded the Benchmark Value of 100 mg/L

26  for TSS.

27      61. On at least fifteen (15) documented occasions since July 23, 2014, the levels of Fe detected

28

Complaint for Declaratory and Injunctive Relief and Civil Penalties

by Defendant in the storm water discharged from the Facility exceeded the Benchmark Value of 1.0 mg/L for Fe.

62. On at least twenty-two (22) documented occasions since July 23, 2014, the levels of Al detected by Defendant in the storm water discharged from the Facility exceeded the Benchmark Value of 0.75 mg/L for Al.

63. On at least four (4) documented occasions since July 23, 2014, the levels of Zn detected by Defendant in the storm water discharged from the Facility exceeded the Benchmark Value of 0.26 mg/L for Zn.

64. On at least nine (9) documented occasions since July 23, 2014, the levels of COD detected by Defendant in the storm water discharged from the Facility exceeded the Benchmark Value of 120 mg/L for COD.

65. On at least one (1) documented occasion since July 23, 2014, the level of O&G detected by Defendant in the storm water discharged from the Facility exceeded the Benchmark Value of 15 mg/L for O&G.

66. On at least two (2) documented occasions since July 23, 2014, the level of Cu detected by Defendant in the storm water discharged from the Facility exceeded the Benchmark Value of 0.0332 mg/L for Cu.

67. The Facility's exceedances of EPA Benchmarks provided above indicate that Defendant have not implemented BAT and BCT at the Facility for its discharges of TSS, O&G, Fe, Al, Zn, Cu, and COD.

68. Plaintiff is informed and believes that Defendant's storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

69. The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.

70. Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from

Complaint for Declaratory and Injunctive Relief and Civil Penalties
13

the Facility to the Impacted Waters during significant rain events.

71. Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

72. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

73. Plaintiff is informed and believes, and thereupon alleges, that Defendants has failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.

74. Plaintiff is informed and believes, and thereupon alleges, that Defendants has discharged, and continues to discharge, unauthorized non-storm water from the Facility.

75. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Failure to Develop and Implement an Adequate
Storm Water Pollution Prevention Plan For the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

76. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

77. Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

78. Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor storage of industrial materials without appropriate best management practices; the lack of specificity and detail required by the General Permit; the failure to include a compliant site map; the continued exposure of significant quantities of industrial materials to storm water

Complaint for Declaratory and Injunctive Relief and Civil Penalties

flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable standards.

79. Defendant has further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit.  General Permit, Sections X.B.1 and X.C.1.b.

80. Defendant continues to violate the Act each day that it fails to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

81. Each day that Defendant has failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant is subject to civil penalties for each and every violation of the Act since July 23, 2014.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

### SECOND CLAIM FOR RELIEF
**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

82. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

83. The General Permit's SWPPP requirements and Effluent Limitation V.A. require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

84. Defendant has failed to implement BAT and BCT at the Facility for its discharges of Total Suspended Solids, Oil and Grease, Aluminum, Iron, Zinc, Copper, and Chemical Oxygen Demand in violation of Effluent Limitation V.A. of the General Permit.

85. Defendant's ongoing failure to implement BAT and BCT at the Facility is evidenced by, *inter alia*, Defendant's chronic exceedances of EPA benchmarks.

86. Each day that Defendant has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

Complaint for Declaratory and Injunctive Relief and Civil Penalties

1311(a).

87. Defendant continues to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

88. Defendant has been in violation of the BAT and BCT requirements at the Facility every day since at least July 23, 2014.  Defendant is subject to civil penalties for each and every violation of the Act since July 23, 2014.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

**THIRD CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Monitoring Implementation Plan for the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

89. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

90. Section X.I and Section XI. of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

91. Defendant has failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendant's ongoing failure to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, its continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants as the General Permit requires.  For example, Defendant has failed to collect the requisite number of storm water samples from the first half of the 2017-2018 reporting period, and the first half of the 2018-2019 reporting period.  Defendant has also failed to collect samples from all discharge locations during each sampling event.

92. Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility each day since at least July 23, 2014.  These violations are ongoing and continuous.

93.  Each day of violation of the General Permit is a separate and distinct violation of Section

301(a) of the Act, 33 U.S.C. §1311(a).  Defendant is subject to civil penalties for each and every violation of the Act since July 23, 2014.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

### FOURTH CLAIM FOR RELIEF
**Discharges of Contaminated Storm Water From The Facility
in Violation of the Permit's Water Quality-Based Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

94. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

95. Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

96. Plaintiff is informed and believes, and thereupon alleges, that since at least July 23, 2014, Defendant has been discharging polluted storm water from the Facility into the Impacted Waters, in violation of the General Permit's Water Quality-based conditions.

97. During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility to the Impacted Waters

98. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

99. Plaintiff is informed and believes, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

100. Plaintiff is informed and believes, and thereupon alleges, that on every day with significant rainfall since July 23, 2014, Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit.  These violations are ongoing and continuous.

101. Every day Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant is subject to civil penalties for each and every violation of the Act since July 23, 2014.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4.

## VII.   RELIEF REQUESTED

Wherefore, CSPA respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from the Facility not in compliance with a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342, and for failing to comply with all substantive and procedural requirements of the General Permit and the CWA as alleged herein.

b.   Enjoin Defendant from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the Act and the General Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit and the Act;

d.   Order Defendant to pay civil penalties of $37,500 per day per violation for all violations occurring after March 9, 2013 and $54,833 per day per violation for all violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4;

e.   Order Defendant to take appropriate actions to restore the quality of navigable waters impaired by its activities;

f.   Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

g.   Award any such other and further relief as this Court may deem appropriate.

Dated: September 23, 2019                    Respectfully Submitted,

LAW OFFICES OF ANDREW L. PACKARD

By: /s/ William N. Carlon
William N. Carlon
Attorney for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

Complaint for Declaratory and Injunctive Relief and Civil Penalties

# EXHIBIT A

Law Offices Of

A N D R E W   L.   P A C K A R D

245 Kentucky Street, Suite B3, Petaluma, CA 94952
Phone (707) 782-4060   Fax (707) 782-4062
Info@PackardLawOffices.com

July 23, 2019

<u>**VIA CERTIFIED MAIL**</u>

William Thomson, Operations Manager
Elder Creek Transfer & Recovery, Inc.
8642 Elder Creek Road
Sacramento, CA 95828

David Burt, Area Environmental Manager
Elder Creek Transfer & Recovery, Inc.
8642 Elder Creek Road
Sacramento, CA 95828

CT Corporation System, Agent for Service
of Process for Elder Creek Transfer &
Recovery Inc.
818 West Seventh Street, Suite 930
Los Angeles, CA 90017

Robert B. Boyer, Chief Executive Officer
Elder Creek Transfer & Recovery, Inc.
18500 North Allied Way
Phoenix, AZ 85054

Re:    **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE
       FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")
       (33 U.S.C. §§ 1251 *et seq.*)**

Dear William Thomson, David Burt, and Robert Boyer:

This firm represents California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at Elder Creek Transfer & Recovery Inc.'s facility located at 8642 Elder Creek Road, in Sacramento, California (the "Facility"). This letter is being sent to you as the responsible owners, officers and/or operators of the Facility, or as the registered agent for this entity. Unless otherwise noted, Elder Creek Transfer & Recovery Inc., William Thomson, David Burt, and Robert Boyer shall hereinafter be collectively referred to as "Elder Creek." The purpose of this letter is to provide Elder Creek with notice of the violations of the Industrial General Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water associated with industrial activities from the Facility into local surface waters.

Elder Creek is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 14-57-DWQ ("General Permit" or "Permit").[1] Prior to July 1, 2015, Elder

---

[1] Elder Creek submitted a Notice of Intent ("NOI") to comply with the General Permit for the Facility on or about February 9, 2018, and again on January 24, 2019. The Facility's Waste Discharge Identification number is 5S34I016593.

Notice of Violation and Intent To File Suit
July 23, 2019
Page 2

Creek's storm water discharges were regulated under Water Quality Order No. 91-13-DWQ, as amended by Water Quality Orders 92-12-DWQ and 97-03-DWQ.

On July 1, 2015, the 2015 General Permit went into effect, superseding the 1997 General Permit that was operative between 1997 and June 30, 2015.  The 2015 General Permit includes many of the same fundamental requirements and implements many of the same statutory requirements as the 1997 General Permit.  Violation of both the 1997 and 2015 General Permit provisions is enforceable under the law.  2015 General Permit, Finding A.6.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Act subjects Elder Creek to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter.  These provisions of law authorize civil penalties of up to $37,500 per day per violation for all Clean Water Act violations occurring after January 12, 2009, and $53,484 per day per violation for all violations that occurred after November 2, 2015.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur.  *See* 40 C.F.R. § 135.2.  As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility.  40 C.F.R. § 135.3(a).  At the expiration of sixty (60) days from the date of this letter, CSPA intends to file suit under Section 505(a) of the Act in federal court against Elder Creek for violations of the Clean Water Act and the Permit.

I.      **Background**

        A.      **California Sportfishing Protection Alliance**

CSPA is a non-profit corporation dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters into which Elder Creek discharges polluted storm water.  Members of CSPA enjoy the waters that the Facility discharges into, including the Sacramento River.  Members of CSPA use and enjoy these waters for their fishing, estuarine habitat and the rare, threatened and endangered species it supports, the wildlife habitat, marine habitat, and other designated beneficial uses.  The discharge of pollutants from the Facility impairs each of these uses.  Discharges of polluted storm water from the Facility are ongoing and continuous.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Elder Creek' failure to comply with the Clean Water Act and the General Permit.

Notice of Violation and Intent To File Suit
July 23, 2019
Page 3

**B.      The Clean Water Act**

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251.  The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute.  33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002).  The Act is administered largely through the NPDES permit program.  33 U.S.C. § 1342.  In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system.  Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme).  The discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal.  *Ecological Rights Found. v. Pacific Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states.  *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program).  The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).  Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California.  33 U.S.C. § 1342.

**C.      California's General Permit for Storm Water Discharges Associated with Industrial Activities**

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ, which CSPA refers to herein as the "1997 General Permit."  On April 1, 2014, pursuant to Order No. 2014-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit.  This permit became effective July 1, 2015.  For purposes of this notice letter, CSPA refers to the reissued permit as the "2015 General Permit."  Accordingly, Elder Creek is liable for violations of the 1997 General Permit and ongoing violations of the 2015 General Permit, and civil penalties and injunctive relief are available remedies.  *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480-81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853-54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121-22 (D.N.J. 1988) ("Limitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI").  1997 General Permit,

Notice of Violation and Intent To File Suit
July 23, 2019
Page 4

Provision E.1; 2015 General Permit, Standard Condition XXI.A.  Facilities must file their NOIs before the initiation of industrial operations.  *Id.*  Facilities must strictly comply with all of the terms and conditions of the General Permit; a violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, effluent limitations, and receiving water limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

### D.     Elder Creek's Facility

Information available to CSPA indicates that Elder Creek's industrial activities at the approximately 19.26-acre Facility include, but are not limited to: the sorting of municipal solid waste, hauling, cleaning, and maintenance of equipment and machinery, and other activities related to the transfer and recovery processes.  The industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Codes 5093 and 4212 ("Scrap and Waste Materials" and "Local Trucking Without Storage," respectively).

Elder Creek collects and discharges storm water associated with industrial activities at the Facility through at least four discharge points into the City of Sacramento storm water drainage system, from which the water ultimately flows into the Sacramento River and the Sacramento-San Joaquin River Delta ("the Delta").  The Delta and is tributaries are waters of the United States within the meaning of the Clean Water Act.

The areas of industrial activity at the Facility are sources of pollutants.  The General Permit requires Elder Creek to analyze storm water samples for TSS, pH, and Oil and Grease. 1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6.  Facilities under SIC Code 5093 must also analyze storm water samples for Iron ("Fe"), Lead ("Pb"), Aluminum ("Al"), Zinc ("Zn") and Chemical Oxygen Demand ("COD").  1997 General Permit, Tables 1-2; 2015 General Permit, Tables 1-2.

## II.     Elder Creek's Violations of the Act and Permit

Based on its review of available public documents, CSPA is informed and believes that Elder Creek is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit.  These violations are ongoing and continuous.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Elder Creek is subject to penalties for violations of the Act since May 13, 2014.

Notice of Violation and Intent To File Suit
July 23, 2019
Page 5

A.     **Elder Creek Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

Elder Creek's storm water sampling results provide conclusive evidence of Elder Creek's failure to comply with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

1.     **Discharge Prohibitions**

The General Permit prohibits all discharges of storm water associated with industrial activities to waters of the United States except as specifically authorized by the General Permit or another NPDES permit.  2015 General Permit, Section III.A.  The General Permit further prohibits the discharge of liquids or materials other than storm water to waters of the United States unless authorized by another NPDES permit.  2015 General Permit, Section III.B.

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  1997 General Permit, Discharge Prohibition A.2; 2015 General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies.  1997 General Permit, Receiving Water Limitation C.2; 2015 General Permit, Discharge Prohibition III.D.

2.     **Technology Based Effluent Limitations**

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A.  Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *Santa Monica Baykeeper v. Kramer Metals,* 619 F. Supp. 2d 914, 920, 923 (C.D. Cal 2009); 1997 General Permit, Effluent Limitations B.5-6; 2015 General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by Elder Creek: total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; iron – 1.0 mg/L; aluminum

Notice of Violation and Intent To File Suit
July 23, 2019
Page 6

– 0.75 mg/L; zinc – 0.26 mg/L; lead – 0.262 mg/L; chemical oxygen demand – 120 mg/L; and, pH – 6.0-9.0 s.u.

### 3.    Receiving Water Limitations

Storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  1997 General Permit, Receiving Water Limitations C.1, C.2; 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations.  1997 General Permit, p. VII; 2015 General Permit, Special Condition XX.B.  The documentation must describe changes the discharger will make to its current storm water Best Management Practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Id.

The *Water Quality Control Plan for the Central Valley Region* (Revised April 2016) ("Basin Plan") also sets forth water quality standards and prohibitions applicable to Elder Creek's storm water discharges.  The Basin Plan identifies present and potential beneficial uses for the Sacramento River, which include municipal and domestic water supply, hydropower generation, agricultural supply, industrial service supply, navigation, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, and contact and non-contact water recreation.

### 4.    Elder Creek's Storm Water Sample Results

The following discharges of pollutants from the Facility have violated the discharge prohibitions, effluent limitations, and receiving water limitations of the Permit:

**a.    Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 2/25/2019 | SWC | TSS | 320 | 100 |
| 12/24/2018 | SWC | TSS | 400 | 100 |
| 2/26/2018 | SWC | TSS | 260 | 100 |
| 2/26/2018 | NWC | TSS | 120 | 100 |
| 1/5/2018 | SWC | TSS | 340 | 100 |
| 1/5/2018 | NWC | TSS | 230 | 100 |

Notice of Violation and Intent To File Suit
July 23, 2019
Page 7

**b.** **Discharge of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 2/25/2019 | SWC | Zn | 0.36 | 0.26 |
| 12/24/2018 | SWC | Zn | 0.38 | 0.26 |
| 2/26/2018 | SWC | Zn | 0.38 | 0.26 |
| 1/5/2018 | SWC | Zn | 0.32 | 0.26 |

**c.** **Discharge of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 3/20/2019 | SWC | Fe | 2.4 | 1.0 |
| 2/25/2019 | SWC | Fe | 9.6 | 1.0 |
| 2/25/2019 | NWC | Fe | 2.2 | 1.0 |
| 12/24/2018 | SWC | Fe | 8.6 | 1.0 |
| 12/24/2018 | NWC | Fe | 3.4 | 1.0 |
| 2/26/2018 | SWC | Fe | 5.1 | 1.0 |
| 2/26/2018 | NWC | Fe | 4.6 | 1.0 |
| 1/5/2018 | SWC | Fe | 7.9 | 1.0 |
| 1/5/2018 | NWC | Fe | 5.2 | 1.0 |
| 2/3/2017 | SEC | Fe | 1.1 | 1.0 |
| 12/15/2016 | NWC | Fe | 1.6 | 1.0 |
| 12/15/2016 | NEC | Fe | 1.2 | 1.0 |
| 10/28/2016 | NEC | Fe | 1.2 | 1.0 |
| 3/11/2016 | NWC | Fe | 1.3 | 1.0 |
| 1/5/2016 | NWC | Fe | 1.1 | 1.0 |

**d.** **Discharge of Storm Water Containing Aluminum (Al) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 2/25/2019 | SWC | Al | 6.2 | 0.75 |
| 2/25/2019 | NWC | Al | 1.6 | 0.75 |
| 12/24/2018 | SWC | Al | 3.9 | 0.75 |
| 12/24/2018 | NWC | Al | 2.9 | 0.75 |
| 2/26/2018 | SWC | Al | 6.1 | 0.75 |
| 2/26/2018 | NWC | Al | 3.4 | 0.75 |
| 1/5/2018 | SWC | Al | 7.7 | 0.75 |

Notice of Violation and Intent To File Suit
July 23, 2019
Page 8

| 1/5/2018 | NWC | Al | 4.9 | 0.75 |
|---|---|---|---|---|
| 2/3/2017 | SEC | Al | 1.3 | 0.75 |
| 12/15/2016 | NWC | Al | 1.7 | 0.75 |
| 12/15/2016 | NEC | Al | 1.4 | 0.75 |
| 10/28/2016 | NEC | Al | 0.99 | 0.75 |
| 3/11/2016 | NWC | Al | 1.1 | 0.75 |
| 3/11/2016 | SEC | Al | 0.83 | 0.75 |
| 1/5/2016 | SEC | Al | 0.78 | 0.75 |
| 1/5/2016 | NWC | Al | 0.84 | 0.75 |
| 4/7/2015 | NWC | Al | 0.87 | 0.75 |
| 4/7/2015 | NEC | Al | 0.76 | 0.75 |
| 12/3/2014 | NEC | Al | 1 | 0.75 |
| 12/3/2014 | SWC | Al | 1.3 | 0.75 |
| 12/3/2014 | NWC | Al | 0.98 | 0.75 |
| 12/3/2014 | SEC | Al | 1.2 | 0.75 |

**e.** **Discharge of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 3/20/2019 | SWC | COD | 210 | 120 |
| 2/25/2019 | SWC | COD | 780 | 120 |
| 12/24/2018 | SWC | COD | 990 | 120 |
| 12/24/2018 | NWC | COD | 160 | 120 |
| 2/26/2018 | SWC | COD | 1100 | 120 |
| 2/26/2018 | NWC | COD | 240 | 120 |
| 1/5/2018 | SWC | COD | 710 | 120 |
| 1/5/2018 | NWC | COD | 670 | 120 |
| 10/28/2016 | SEC | COD | 140 | 120 |

**f.** **Discharge of Storm Water Containing Oil & Grease (O&G) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|---|---|---|---|---|
| 1/5/2018 | SWC | O&G | 26 | 15 |

Notice of Violation and Intent To File Suit
July 23, 2019
Page 9

> **g.** **Discharge of Storm Water Containing Copper (Cu) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|------|------|------|------|
| 2/25/2019 | SWC | Cu | 0.048 | 0.0332 |
| 1/5/2018 | SWC | Cu | 0.051 | 0.0332 |

> **h.** **Elder Creek's Sample Results Are Evidence of Violations of the General Permit**

Elder Creek's sample results demonstrate violations of the General Permit's discharge prohibitions, technology based effluent limitations, and receiving water limitations set forth above. CSPA is informed and believes that Elder Creek has known that its storm water contains pollutants at levels exceeding General Permit standards since at least July 23, 2014.

CSPA alleges that such violations occur each time storm water discharges from the Facility. Attachment A hereto, sets forth the specific rain dates on which CSPA alleges that Elder Creek has discharged storm water containing impermissible levels of TSS, Fe, Al, COD, Zn, Cu, and O&G in violation of the General Permit. 1997 General Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2; 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B. Elder Creek may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, CSPA includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

> **5.** **Elder Creek Has Failed to Implement BAT and BCT**

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* 1997 General Permit, Sections A.8.a-b; 2015 General Permit, Sections X.H.1-2.

Elder Creek has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Permit, Section X.H.1(a-g). Elder Creek has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with

Notice of Violation and Intent To File Suit
July 23, 2019
Page 10

the General Permit's effluent limitations.  1997 General Permit, Section A.8.b; 2015 General Permit, Sections X.H.2.

Each day that Elder Creek has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Elder Creek has been in violation of the BAT and BCT requirements at the Facility every day since at least July 23, 2014.

### 6.  Elder Creek Has Failed to Implement an Adequate Monitoring Implementation Plan

The General Permit requires dischargers to implement a Monitoring Implementation Plan.  2015 General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  2015 General Permit, Section X.I.2.a.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  2015 General Permit, Section XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  2015 General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment. 2015 General Permit, Section XI.B.6.  Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  2015 General Permit Section XI.B.11.

Elder Creek has failed to develop and implement an adequate Monitoring Implementation Plan.  These failures include: using analytical test methods with method detection limits higher than existing approved analytical test methods to analyze samples of storm water; failing to collect samples from all discharge points during each sampling event; and, failing to collect the required number of samples during each reporting period.

Each day that Elder Creek has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit.  Elder Creek has been in violation of the Monitoring Implementation Plan requirements every day since at least July 23, 2014.

### 7.  Elder Creek Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan

The General Permit requires dischargers to develop and implement a site-specific SWPPP.  1997 General Permit, Section A.1; 2015 General Permit, Section X.A.  The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site

map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.  *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year.  2015 General Permit, Section X.B; see also 1997 General permit, Section A.

CSPA's investigation indicates that Elder Creek has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements.  Elder Creek has further failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous NAL exceedences across multiple pollutant parameters.

Each day Elder Creek failed to develop and implement an adequate SWPPP is a violation of the General Permit.  The SWPPP violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit.  Elder Creek has been in violation of these requirements at the Facility every day since at least July 23, 2014.

## 8.     Elder Creek Has Failed to File Timely, True and Correct Reports

Section XVI of the 2015 General Permit requires dischargers to submit an Annual Report by July 15th of each reporting year to the Regional Board.  The Annual Report must be signed and certified by a discharger's Legally Responsible Person, or Duly Authorized Representative. 2015 General Permit, Sections XVI.A, XXI.K.  The Annual Report must include a compliance checklist, certifying compliance with the General Permit and an explanation of any non-compliance.  2015 General Permit, Section XVI.B.

CSPA's investigations indicate that Elder Creek has submitted incomplete Annual Reports and purported to comply with the Permit despite significant noncompliance at the Facility.

## III.    Persons Responsible for the Violations

CSPA puts Elder Creek on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Elder Creek on formal notice that it intends to include those persons in this action.

Notice of Violation and Intent To File Suit
July 23, 2019
Page 12

**IV.    Name and Address of Noticing Parties**

      The name, address and telephone number of each of the noticing parties is as follows:

      Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainer Avenue
Stockton, CA 95204
(209) 464-5067

**V.    Counsel**

      CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

  Andrew L. Packard
  William N. Carlon
  Law Offices Of Andrew L. Packard
  245 Kentucky Street, Suite B3
  Petaluma, CA 94952
  (707) 782-4060
  andrew@packardlawoffices.com
  wncarlon@packardlawoffices.com

**VI.    Conclusion**

      CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against Elder Creek and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

_____
Andrew L. Packard
Law Offices of Andrew L. Packard
Counsel for CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

Notice of Violation and Intent To File Suit
July 23, 2019
Page 13

## SERVICE LIST

### VIA CERTIFIED MAIL

Andrew Wheeler, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Mike Stoker, Acting Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

William Barr, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Eileen Sobeck, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Patrick Pulupa, Executive Officer
Central Valley Regional Water Quality Control Board
11020 Sun Center Drive, Suite 200
Rancho Cordova, CA 95670

**ATTACHMENT A**
**Notice of Intent to File Suit, Elder Creek**
**Significant Rain Events,\* July 23, 2014 – July 23, 2019**

| | | | |
|---|---|---|---|
| 9/25/2014 | 1/17/2016 | 1/3/2017 | 11/9/2017 |
| 10/31/2014 | 1/18/2016 | 1/4/2017 | 11/15/2017 |
| 11/13/2014 | 1/19/2016 | 1/7/2017 | 11/16/2017 |
| 11/20/2014 | 1/22/2016 | 1/8/2017 | 11/17/2017 |
| 11/22/2014 | 1/23/2016 | 1/9/2017 | 11/26/2017 |
| 11/28/2014 | 1/29/2016 | 1/10/2017 | 11/27/2017 |
| 11/29/2014 | 2/17/2016 | 1/11/2017 | 1/3/2018 |
| 11/30/2014 | 2/18/2016 | 1/12/2017 | 1/4/2018 |
| 12/2/2014 | 3/4/2016 | 1/18/2017 | 1/5/2018 |
| 12/3/2014 | 3/5/2016 | 1/19/2017 | 1/8/2018 |
| 12/5/2014 | 3/6/2016 | 1/20/2017 | 1/9/2018 |
| 12/11/2014 | 3/7/2016 | 1/21/2017 | 1/18/2018 |
| 12/12/2014 | 3/10/2016 | 1/22/2017 | 1/22/2018 |
| 12/15/2014 | 3/11/2016 | 2/2/2017 | 1/24/2018 |
| 12/16/2014 | 3/12/2016 | 2/3/2017 | 2/26/2018 |
| 12/19/2014 | 3/13/2016 | 2/5/2017 | 3/1/2018 |
| 2/6/2015 | 3/14/2016 | 2/6/2017 | 3/2/2018 |
| 2/8/2015 | 4/9/2016 | 2/7/2017 | 3/8/2018 |
| 3/11/2015 | 4/10/2016 | 2/8/2017 | 3/13/2018 |
| 4/5/2015 | 4/22/2016 | 2/9/2017 | 3/14/2018 |
| 4/7/2015 | 4/27/2016 | 2/16/2017 | 3/15/2018 |
| 4/24/2015 | 5/5/2016 | 2/17/2017 | 3/16/2018 |
| 4/25/2015 | 5/20/2016 | 2/19/2017 | 3/20/2018 |
| 5/7/2015 | 10/14/2016 | 2/20/2017 | 3/21/2018 |
| 10/17/2015 | 10/15/2016 | 2/21/2017 | 3/22/2018 |
| 11/1/2015 | 10/16/2016 | 3/4/2017 | 4/6/2018 |
| 11/2/2015 | 10/25/2016 | 3/20/2017 | 4/7/2018 |
| 11/8/2015 | 10/27/2016 | 3/21/2017 | 4/16/2018 |
| 11/9/2015 | 10/28/2016 | 3/22/2017 | 5/25/2018 |
| 11/15/2015 | 10/30/2016 | 3/24/2017 | 11/21/2018 |
| 12/3/2015 | 11/19/2016 | 4/6/2017 | 11/22/2018 |
| 12/13/2015 | 11/20/2016 | 4/7/2017 | 11/23/2018 |
| 12/18/2015 | 11/23/2016 | 4/8/2017 | 11/28/2018 |
| 12/19/2015 | 11/26/2016 | 4/12/2017 | 11/29/2018 |
| 12/21/2015 | 11/27/2016 | 4/13/2017 | 12/1/2018 |
| 1/4/2016 | 12/7/2016 | 4/16/2017 | 12/5/2018 |
| 1/5/2016 | 12/8/2016 | 4/17/2017 | 12/16/2018 |
| 1/6/2016 | 12/10/2016 | 4/19/2017 | 12/17/2018 |
| 1/13/2016 | 12/15/2016 | 6/8/2017 | 12/24/2018 |
| 1/15/2016 | 12/23/2016 | 11/4/2017 | 12/25/2018 |
| 1/16/2016 | 1/2/2017 | 11/8/2017 | 1/5/2019 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Elder Creek**
**Significant Rain Events,* July 23, 2014 – July 23, 2019**

| | |
|---|---|
| 1/6/2019 | 2/26/2019 |
| 1/9/2019 | 2/27/2019 |
| 1/15/2019 | 3/2/2019 |
| 1/16/2019 | 3/5/2019 |
| 1/20/2019 | 3/6/2019 |
| 2/1/2019 | 3/19/2019 |
| 2/2/2019 | 3/20/2019 |
| 2/4/2019 | 3/22/2019 |
| 2/8/2019 | 3/23/2019 |
| 2/9/2019 | 3/25/2019 |
| 2/13/2019 | 3/27/2019 |
| 2/14/2019 | 4/2/2019 |
| 2/15/2019 | 4/5/2019 |
| 2/25/2019 | |
| 2/26/2019 | |
| 2/27/2019 | |
| 3/2/2019 | |
| 3/5/2019 | |
| 3/6/2019 | |
| 3/19/2019 | |
| 3/20/2019 | |
| 3/22/2019 | |
| 3/23/2019 | |
| 3/25/2019 | |
| 3/27/2019 | |
| 4/2/2019 | |
| 4/5/2019 | |
| 1/6/2019 | |
| 1/9/2019 | |
| 1/15/2019 | |
| 1/16/2019 | |
| 1/20/2019 | |
| 2/1/2019 | |
| 2/2/2019 | |
| 2/4/2019 | |
| 2/8/2019 | |
| 2/9/2019 | |
| 2/13/2019 | |
| 2/14/2019 | |
| 2/15/2019 | |
| 2/25/2019 | |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.