1    ANDREW L. PACKARD (State Bar No. 168690)
     WILLIAM N. CARLON (State Bar No. 305739)
2    Law Offices of Andrew L. Packard
     245 Kentucky Street, Suite B3
3    Petaluma, CA 94952
     Tel: (707) 782-4060
4    Fax: (707) 782-4062
     E-mail: andrew@packardlawoffices.com
5        wncarlon@packardlawoffices.com

6    Attorneys for Plaintiff
     CALIFORNIA SPORTFISHING
7    PROTECTION ALLIANCE

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   CALIFORNIA SPORTFISHING              Case No: 2:19-cv-01934-TLN-CKD
     PROTECTION ALLIANCE,

12           Plaintiff,                   **STIPULATION TO DISMISS CLAIMS
                                          WITH PREJUDICE; ORDER GRANTING
13       v.                              DISMISSAL WITH PREJUDICE [FRCP
                                          41(a)(2)]**
14   ELDER CREEK TRANSER & RECOVERY,
     INC.,

15           Defendant.

16

17

18

19           Plaintiff California Sportfishing Protection Alliance ("CSPA") and Defendant Elder Creek

20   Transfer & Recovery, Inc. ("ECTR") in the above-captioned action, stipulate as follows:

21           WHEREAS, on or about July 23, 2019, CSPA provided ECTR with a Notice of

22   Violations and Intent to File Suit ("CWA 60-Day Notice Letter") under Section 505 of the

     Federal Water Pollution Control Act ("Act" or "Clean Water Act"), 33 U.S.C. § 1365;

23           WHEREAS, on September 23, 2019, CSPA filed its Complaint against ECTR in this

24   Court and said Complaint incorporated by reference all of the allegations contained in CSPA's

25   CWA 60-Day Notice Letter;

26           WHEREAS, CSPA and ECTR, through their authorized representatives and without either

27   adjudication of CSPA's claims or admission by ECTR of any alleged violation or other

28   wrongdoing, have chosen to resolve in full by way of settlement agreement the allegations of

                                         - 1 -

CSPA as set forth in CSPA's CWA 60-Day Notice Letter and Complaint, thereby avoiding the costs and uncertainties of further litigation. A copy of the Parties' proposed consent decree ("Settlement Agreement") entered into by and between CSPA and ECTR is attached hereto as **Exhibit A** and incorporated by reference;

WHEREAS, CSPA has submitted the Settlement Agreement via certified mail, return receipt requested, to the U.S. EPA and the U.S. Department of Justice and the U.S. Department of Justice has now filed their "Non-Opposition to Consent Judgment" (ECF No. 21);

NOW THEREFORE, IT IS HEREBY STIPULATED and agreed to by and between the Parties that CSPA's claims as set forth in its CWA 60-Day Notice Letter and Complaint, be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2). The Parties respectfully request an order from this Court dismissing such claims with prejudice. In accordance with Section III, Paragraph 1 of the Settlement Agreement, the Parties also request that this Court retain and have jurisdiction over the Parties through October 31, 2022, for the sole purpose of resolving any disputes between the Parties with respect to enforcement of any provision of the Settlement Agreement.

Dated: March 16, 2020

Respectfully submitted,
LAW OFFICES OF ANDREW L. PACKARD

By: /s/ Andrew L. Packard
Andrew L. Packard
Attorneys for Plaintiff
California Sportfishing Protection Alliance

Dated: March 16, 2020

LAW OFFICES OF THOMAS M. BRUEN

By: /s/ Thomas M. Bruen
Thomas M. Bruen
Attorneys for Defendant
Elder Creek Transfer & Recovery, Inc.

# ORDER

Good cause appearing, and the Parties having stipulated and agreed,

IT IS HEREBY ORDERED that Plaintiff California Sportfishing Protection Alliance claims against Defendant Elder Creek Transfer & Recovery, Inc., as set forth in CSPA's CWA 60-Day Notice Letter and Complaint, are hereby dismissed with prejudice, each side to bear their own attorney fees and costs, except as provided for by the terms of the accompanying Settlement Agreement.

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the Parties, with respect to disputes arising under the Settlement Agreement attached to the Parties' Stipulation to Dismiss as **Exhibit A,** until October 31, 2022.

IT IS SO ORDERED.


Dated:  March 16, 2020

_____
Troy L. Nunley
United States District Judge

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and between Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA") and Defendant Elder Creek Transfer & Recovery (hereinafter "ECTR" or "Defendant"), as follows:

### Recitals

**WHEREAS**, Plaintiff CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, Defendant ECTR operates a 19.26-acre waste transfer station located at 8642 Elder Creek Road, in Sacramento, California ("the Facility");

**WHEREAS,** CSPA and Defendant collectively shall be referred to as the "Parties;"

**WHEREAS**, the Facility collects and discharges storm water generated from within the Facility into storm water conveyances which discharge into the City of Sacramento's storm water drainage system, which then discharges to Morrison Creek, which discharges to the Sacramento River, and the Sacramento-San Joaquin Delta (a map of the Facility is attached hereto as **Exhibit A** and incorporated herein by reference). Morrison Creek, the Sacramento River, and the Sacramento-San Joaquin Delta are waters of the United States within the meaning of the Clean Water Act;

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 14-57-DWQ, issued pursuant to Section 402(p) of the Clean Water Act ("Act"), 33 U.S.C. §1342(p), (hereinafter "General Permit") and, prior to July 1, 2015, were regulated by Water Quality Order No. 91-13-DWQ, as amended by Water Quality Orders 92-12-DWQ and 97-03-DWQ;

**WHEREAS**, on or about July 23, 2019, Plaintiff provided notice of Defendant's alleged violations of the Act, and of its intention to file suit against Defendant to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX;

the U.S. Attorney General; the Executive Director of the State Board; the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CSPA's Notice Letter is attached hereto as **Exhibit B** and incorporated herein by reference);

**WHEREAS**, Defendant denies the occurrence of the violations alleged in the Notice Letter and maintains that it has complied at all times with the provisions of the General Permit and the Clean Water Act and maintains that there are no "ongoing and continuous" violations of the General Permit or the Act, and Defendant asserts other defenses;

**WHEREAS**, on or about September 23, 2019, CSPA filed a complaint against Defendant in the United States District Court, Eastern District of California (this matter is hereinafter referred to as "the Action");

**WHEREAS**, the Parties agree that it is in their mutual interest to resolve this matter as to all entities and persons named in the Notice Letter and Complaint without further litigation and enter into this Agreement;

**WHEREAS**, for purposes of this Agreement only, the Parties stipulate that venue is proper in the United State District Court for the Eastern District of California, and that Defendant does not contest the exercise of jurisdiction by this Court to dismiss this matter with prejudice under the terms of this Agreement and also to retain jurisdiction for the purpose of enforcing this Agreement pursuant to F.R. Civ. P. 41(a);

**WHEREAS**, within five (5) calendar days of mutual execution, this Agreement shall be submitted by Plaintiff's counsel to the United States Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c);

**WHEREAS,** at the time the Agreement is submitted to the United States Department of Justice for the 45-day statutory review period, CSPA shall file a Notice of Settlement in the District Court and inform the Court of the expected dismissal date following the expiration of the statutory review period identified above;

**AND WHEREAS**, within ten (10) calendar days of expiration of the statutory review period, or the earlier receipt of non-objection from the United States Department of Justice, the

Parties shall file with the Court a Stipulation and Order that shall provide that the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) concurrently with the District Court's retention of jurisdiction for the enforcement of this Agreement as provided herein (the date of entry of the Order to dismiss shall be referred to herein as the "Court Entry Date").

**THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AS FOLLOWS:**

I.  **COMMITMENTS OF DEFENDANT**

1. **Compliance with General Permit and the Clean Water Act.** Throughout the term of this Agreement, and subject to Force Majeure as defined herein, Defendant shall continue implementing all best management practices needed to operate the Facility in compliance with the requirements of the General Permit and the Clean Water Act, subject to any defenses available under the law.

2. **Implementation of Specific Storm Water Best Management Practices.** Unless otherwise indicated below, on or before October 1, 2020, and subject to Force Majeure as defined herein, Defendant shall complete the implementation and incorporation into the Facility's Storm Water Pollution Prevention Plan ("SWPPP") of the following storm water source control measures/Best Management Practices ("BMPs") at the Facility:

(a) *Re-Surfacing of Degraded Areas in Drainage Areas 1 and 2.* ECTR shall resurface the shaded areas on the map attached hereto as **Exhibit C** by adding three layers to the pavement, consisting of a layer of course aggregate, followed by a layer of fine aggregate and then by a final layer of sealant.

(b) *Elimination of Run-on from Adjacent Property Along the Western Facility Boundary.* ECTR shall place sand bags on the inward side of the Facility fence to prevent as best as practicable storm water run-on occurring on the Western boundary of the Facility.

(c) **_Advanced Filtration to Address Metals._** ECTR shall install FILTREXX Metalox[1] wattles at all of the Facility's drop inlets, and at a rock check damn in the bioswale upstream of each drop inlet on the western, southern and eastern boundaries of the Facility.

(d) **_Installation of a Digital Rain Gauge._** ECTR shall install and maintain a fully automated rain gauge at the Facility for the Term of the Agreement. All records of rain events shall be maintained at the Facility as required under the General Permit.

(e) **_Increased Employee Training_**. ECTR shall increase training for its Storm Water Pollution Prevention Team ("SWPPT"), including at a minimum, holding a semi-annual training meeting in September-October and a second one in December -January of each year. ECTR shall incorporate the holding of these twice-annual meetings in its new SWPPP, and target training on tracking what storm events qualify for sampling purposes, undertaking visual monitoring, and logging and properly reporting data in the Facility's SWPPP, Annual Report and the State's on-line reporting system ("SMARTS"). ECTR shall log these meetings with the date, materials covered, written agenda, and a list of attendees for each, and shall retain these logs at the Facility. ECTR shall have at least one member of the SWPPT formally certified as a Qualified Industrial Storm Water Practitioner ("QISP") at all time during the term of this agreement.

(f) **_Increased Facility Sweeping._** ECTR shall use a regenerative sweeper (i.e., a Tymco 600 or equivalent) on all readily accessible paved areas of the Facility twice weekly during the Wet Season (October 1 through May 31) and weekly during the period from June 1 through September 30. Records of all sweeping dates and times shall be maintained at the Facility. For areas on which dumpsters and/or bins are located, ECTR shall move those dumpsters/bins in September and January of each year during the Term and sweep under the dumpsters/bins with a regenerative sweeper.

---

[1] ECTR shall install, maintain, repair and replace these filtration devices in accordance with all of the manufacturer's instructions and specifications for the Term of this agreement.

(g)    ***Re-Direction of Downspout Discharges.***  Should storm water sampling for 2020-2021 Wet Season show that ECTR has not met, for that wet season, the General Permit NALs for each of the parameters in Exhibit D despite the resurfacing of the paved areas pursuant to Paragraph 2(a) and implementation of the other BMPs described in this Paragraph 3, ECTR shall, on or before October 1, 2021, spend up to $100,000 in design and construction to redirect storm water flows from the approximately fifteen (15) downspouts on the main Facility building to one or more subsurface conveyances to avoid, to the extent practicable, the co-mingling of such flows with storm water falling on, and traveling across, the non-roof surfaces of the Facility prior to discharge. Should ECTR be unable to accomplish this goal for a total cost within the $100,000 limit, ECTR will implement the redirection of storm water flows from the Facility building roof to the extent practicable for a cost of, but not to exceed, $100,000 by the October 1, 2021 deadline.

**3.    SWPPP Amendments.**  On or before October 1, 2020, Defendant shall amend the Facility SWPPP to incorporate all of the relevant requirements of this Agreement and the General Permit that are then implemented or being implemented.  These revisions shall reflect all then-current site conditions and practices, and identify as  potential pollutants per the General Permit those contaminants listed in **Exhibit D**, identify the location of all pervious and impervious areas, drop inlets, BMPs, and storm water flow vectors.  These revisions shall also provide for data logging required by the General Permit; weekly monitoring and maintenance of all Facility collection and discharge points during the Wet Season; and twice-annual storm water management training for Facility employees.

**4.    Sampling Frequency.**  For the 2020-2021 and 2021-2022 reporting years ending June 30th (2021 and 2022), Defendant shall collect and analyze samples from three Qualifying Storm Events[2] ("QSEs") within the first half of each reporting year (July 1 to

---

[2] A Qualifying Storm Event (QSE) is defined in the General Permit as a precipitation event that: (a) Produces a discharge for at least one drainage area; and (b) is preceded by 48 hours with no discharge from any drainage area.  *See* General Permit, Section XI(b)(1).

December 31), and three QSEs within the second half of each reporting year (January 1 to June 30). The storm water sample results shall be compared with the values set forth in **Exhibit D**, attached hereto, and incorporated herein by reference. If the results of such samples exceed the annual average parameter values set forth in **Exhibit D** as these parameter values (e.g., instantaneous versus average values) are applied in accordance with the General Permit, Defendant shall comply with the "Action Memorandum" requirements set forth below per the General Permit and this Agreement. If Defendant does not collect and analyze samples from all Facility discharge points during three QSEs within the first half of a reporting year, Defendant shall provide an explanation to CSPA on or before January 10th describing why three samples were not collected and/or properly analyzed. If Defendant does collect and analyze samples from all Facility discharge points during three QSEs during the first half of the reporting year, and analyze them for all parameters required herein, then Defendant may elect to waive one of the three required samples during the second half of that reporting year.

5. **Sampling Parameters.** All samples in each reporting year shall be analyzed for each of the constituents listed in **Exhibit D**, by a laboratory accredited by the State of California, except for pH, which shall be analyzed in the field using a handheld, properly calibrated pH meter. All samples collected from the Facility shall be delivered to the laboratory as soon as possible to ensure that sample "hold time" is not exceeded. Analytical methods used by the laboratory shall comply with General Permit requirements in regards to both test method and detection limit. See General Permit, Table 2, at 43. Sampling results shall be provided to CSPA within ten (10) days of Defendant's receipt of the laboratory report from each sampling event, pursuant to the Notice provisions below.

6. **Exceedance Response Actions ("ERA"); CSPA's Review Of ERA Reports; Meet-and-Confer.** If the results of sampling discussed herein exceed the applicable NALs set forth in **Exhibit D**, Defendant shall comply with the applicable requirements of the General Permit, including the applicable Exceedance Response Action ("ERA") described in Sections I.M and XII of the General Permit. Any Level 1 ERA Evaluation required under Section XII.C.1 of the General Permit during the Term of this Agreement shall be memorialized in a

memorandum and shared with Plaintiff pursuant to the Notice provisions of this Agreement on or before its due date (October 1); at Plaintiff's request, the parties shall meet and confer regarding the sufficiency of the evaluation. Any Level 1 ERA Report required under Section XII.C.2 of the General Permit during the Term of this Agreement shall be shared with Plaintiff pursuant to the Notice provisions of this Agreement on or before its due date (January 1); at Plaintiff's request, the parties shall meet and confer regarding the sufficiency of the report. Any Level 2 ERA Action Plan required under Section XII.D.1 of the General Permit during the Term of this Agreement shall be shared with Plaintiff pursuant to the Notice provisions of this Agreement on or before its due date (January 1); at Plaintiff's request, the parties shall meet and confer regarding the sufficiency of the plan. Any Level 2 ERA Technical Report required under Section XII.D.2 of the General Permit during the Term of this Agreement shall be shared with Plaintiff pursuant to the Notice provisions of this Agreement on or before its due date (January 1); at Plaintiff's request, the parties shall meet and confer regarding the sufficiency of the report.

7.      **Inspections During The Term Of This Agreement.**  In addition to any site inspections conducted as part of the settlement process and the meet-and-confer process concerning an Action Memorandum as set forth above, Defendant shall permit representatives of CSPA to perform up to three (3) physical inspections of the Facility during the Term of this Agreement. These inspections shall be performed by CSPA's counsel and consultants and may include sampling, photographing, and/or videotaping and CSPA shall provide Defendant with a copy of all sampling reports, photographs and/or video. Sampling shall be performed in accordance with California State Water Quality Control Board guidelines. CSPA shall provide at least two (2) business days advance notice of such physical inspection, except that Defendant shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals. In such case, Defendant shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by CSPA may proceed. Defendant shall not make any alterations to Facility conditions during the period between receiving CSPA's initial two business day advance notice and the start of CSPA's inspection that Defendant would

not otherwise have made but for receiving notice of CSPA's request to conduct a physical inspection of the Facility, excepting any actions taken in compliance with any applicable laws or regulations. Nothing herein shall be construed to prevent Defendant from continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by CSPA or at any time.

**8.     Communications To/From Regional and State Water Boards.** During the term of this Agreement, Defendant shall provide CSPA with copies of all documents submitted to, or received from, the Regional Water Board or the State Water Board concerning storm water discharges from the Facility, including, but not limited to, all documents and reports submitted to the Regional Water Board and/or State Water Board as required by the current General Permit. Such documents and reports shall be provided to CSPA pursuant to the Notice provisions set forth below and reasonably contemporaneously with Defendant' submission(s) to, or, receipt from, such agencies.

**9.     SWPPP Amendments.** Pursuant to the Notice provisions set forth below, Defendant shall provide CSPA with a complete copy of the updated version of the Facility SWPPP within fifteen (15) days of any amendments to the Facility SWPPP made during the Term of the Agreement.

## II.     MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS

**10.     Defendant's Total Monetary Obligation.** As and for Defendant's settlement payment, Defendant shall pay a total of One Hundred Seven Thousand Five Hundred Dollars ($107,500), as follows:

**11.     Mitigation Payment In Lieu Of Civil Penalties Under the Clean Water Act.** As mitigation to address any potential harms from the Clean Water Act violations alleged in the Action, Defendant agrees to pay the sum of $42,500 to the Rose Foundation for Communities and the Environment ("Rose Foundation") for projects to improve water quality in Morrison Creek, the Sacramento River, and the Sacramento-San Joaquin Delta. The mitigation payment shall be remitted directly to the Rose Foundation at: Rose Foundation, Attn: Tim Little, 201 4th Street, Suite 102, Oakland, CA 94607 within twenty (20) days of the Court Entry Date.

- 8 -

**12.     Compliance Monitoring Funding.**  To defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring Defendant's compliance with this Agreement, Defendant agrees to pay $10,000 for the Term of the Agreement, for compliance monitoring conducted by counsel for CSPA as described below. Payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" and remitted to Plaintiff's counsel at the Notice address provided herein within twenty (20) days of the Court Entry Date.

**13.     Reimbursement of Fees & Costs.**  Defendant agrees to reimburse CSPA the amount of $55,000 in full settlement of and to defray CSPA's reasonable investigative, expert, consultant, and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the action, and negotiating a resolution of this action in the public interest.  Such payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney Client Trust Account" and remitted to the firm at the Notice address provided herein within twenty (20) days of the Court Entry Date.

## III.     DISPUTE RESOLUTION AND ENFORCEMENT OF AGREEMENT

**14.**     With the exception of the timelines set forth above for addressing exceedances of values specified in **Exhibit D** and the ERA reports, if a dispute under this Agreement arises, or either Party believes that a breach of this Agreement has occurred, the Parties shall meet and confer within ten (10) business days of receiving written notification from the other Party of a request for a meeting to determine whether a breach has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute.  If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least ten (10) business days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including filing a motion with the District Court of California, Eastern District, which shall retain jurisdiction over the Action until the Termination Date for the limited purposes of enforcement of the terms of this Agreement.  The Parties shall be entitled to seek reasonable fees and costs incurred in any such motion, and such reasonable fees and costs may be awarded in an amount as determined in the Court's discretion,

- 9 -

pursuant to the provisions set forth in the then-applicable federal Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such provisions. This Dispute Resolution process for enforcement of this Agreement shall be the exclusive remedy for resolving any disputes between the parties that arise regarding the Facility during the Term of this Agreement.

15.     **CSPA's Waiver and Release.**  Upon the Court Approval Date of this Agreement, CSPA, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendant and its officers, directors, employees, shareholders, direct and indirect parents, subsidiaries, and affiliates, and each of its predecessors, successors and assigns, and each of its agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from, and waives all claims which arise from or pertain to the Action, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in this Action, for the alleged failure of any Released Defendant Party to comply with the Clean Water Act at the Facility, up to the Court Entry Date.

16.     **Defendant's Waiver and Release.**  Defendant, on its own behalf and on behalf of any Released Defendant Party under its control, release CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action.

17.     **Force Majeure.**  No Party shall be considered to be in default in the performance of any of its obligations under this Agreement when performance becomes impossible or infeasible due to circumstances beyond the Party's control, including Force Majeure, which includes any act of god, war, fire, earthquake, windstorm, flood or natural catastrophe; civil disturbance, vandalism, sabotage, or terrorism; restraint by court order or by

- 10 -

any public authority or agency; action or non-action by, or inability to obtain the necessary authorizations, approvals, or permits from, any governmental agency, including Sacramento County; or inability to obtain equipment or materials from the marketplace if such materials or equipment are not reasonably available, though the cost of such material or equipment is not a factor in whether it is reasonably available. Impossibility and/or Force Majeure shall not include normal inclement weather, economic hardship, or inability to pay, although economic feasibility is a factor in determining if a Party has implemented BAT and/or BCT.

The proposed structural BMPs described in this Agreement may require building permits and other permits from the County. They may also require modifications to the Facility's Solid Waste Facilities Permit by the County Local Enforcement Agency. Defendant cannot lawfully construct any individual structural BMP for which permits are required from the County until the final permit(s) for that individual BMP has been issued. Should any such permit for an individual structural BMP not be issued by the County within the time period needed to reasonably meet the applicable compliance deadline in this Consent Decree, the time permits for compliance in this Consent Decree shall be reasonably extended to account for such delay. Should the County decline to issue any such permit, the parties shall meet and confer regarding an alternative BMP designed to achieve the same pollution control effectiveness as the original BMP. ECTR shall exercise its best efforts to timely obtain all such permits and, where available, shall pay expedited permit processing fees.

Any Party seeking to rely upon this paragraph 16 to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the impossibility or Force Majeure event and which by exercise of due diligence has been unable to overcome the failure or performance. Delay in compliance with a specific obligation under this Agreement due to impossibility and/or Force Majeure as defined in this paragraph shall not excuse or delay compliance with any or all other obligations required under this Agreement.

16.1  If Defendant claims compliance was or is impossible, they shall notify Plaintiff in writing as soon as possible, but in no event more than fifteen (15) business days of the date that Defendant learns of the event or circumstance that caused or would

- 11 -

cause a violation of this Agreement (hereinafter referred to as the "Notice of Nonperformance").

16.2  The Notice of Nonperformance shall include a detailed description of the reason for the nonperformance and the specific obligations under the Agreement that are or have been affected by the Force Majeure. They shall describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by Defendant to prevent or minimize the delay, the schedule by which the measures shall be implemented, and the anticipated date of compliance. Defendant shall adopt all reasonable measures to avoid and minimize such delays.

16.3  The Parties shall meet and confer in good faith within ten (10) calendar days concerning the non-performance and, where the Parties concur that performance was or is impossible due to an event or matter covered under the Force Majeure provisions of this Agreement, despite the timely good faith efforts of Defendant, new deadlines shall be established.

16.4  If Plaintiff disagrees with Defendant's Notice of Nonperformance, or in the event that the Parties cannot timely agree on the terms of new performance deadlines or requirements, either Party shall have the right to invoke the dispute resolution procedures herein pursuant to Section 13.

IV.    **MISCELLANEOUS PROVISIONS**

**18.**    The Parties enter into this Agreement for the purpose of avoiding prolonged and costly litigation.  Nothing in this Agreement shall be construed as, and Defendant expressly does not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Agreement constitute or be construed as an admission by Defendant of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Agreement.

**19.**    The Agreement shall be effective upon mutual execution by all Parties.  The Agreement shall terminate on the "Termination Date," which shall be October 31, 2022.

20.     The Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.  An executed copy of this Agreement shall be valid as an original.

21.     In the event that any one of the provisions of this Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

22.     The language in all parts of this Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning.  This Agreement shall be construed pursuant to the law of the United Sates, without regard to choice of law principles.

23.     The undersigned are authorized to execute this Agreement on behalf of their respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Agreement.

24.     All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Agreement are contained herein.  This Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Agreement, unless otherwise expressly provided for therein.

25.     **Notices.**  Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to CSPA pursuant to this Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

William Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainer Avenue
Stockton, California 95204
Tel: (209) 464-5067
E-mail: deltakeep@me.com

With copies sent to:

Andrew L. Packard
William N. Carlon
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, California 94952
Tel:  (707) 782-4060

- 13 -

E-mail: andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to Defendant pursuant to this Agreement shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

Michael Caprio
Area Vice President
Elder Creek Transfer and Recovery, Inc. c/o
Republic Services
18500 North Allied Way
Phoenix, AZ 85054
E-mail: mcaprio@republicservices.com and
jgeorge4@republicservices.com

With copies sent to:

Thomas M. Bruen
Law Offices of Thomas M. Bruen
1990 North California Blvd., Suite 608
Walnut Creek, California 94596
Tel: (925) 295-3137
E-mail: tbruen@tbsglaw.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

26. Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

27. If for any reason the Court should decline to enter this Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Agreement within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Agreement in a mutually acceptable manner, this Agreement shall become null and void.

28. This Agreement shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

29. This Agreement and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Agreement, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings,

- 14 -

and communications of the Parties, whether oral or written, respecting the matters covered by this Agreement.

    **30.**    This Agreement may be amended or modified only by a writing signed by the Parties or their authorized representatives.


Dated:  January 27, 2020       California Sportfishing Protection Alliance


By:    _____
       William Jennings, Executive Director


Dated:  January_____, 2020      Elder Creek Transfer & Recovery


By:    _____
       Michael Caprio, Area President

1  and communications of the Parties, whether oral or written, respecting the matters covered by

2  this Agreement.

3      30.     This Agreement may be amended or modified only by a writing signed by the

4  Parties or their authorized representatives.

5

6  Dated: January_____, 2020      California Sportfishing Protection Alliance

7

8                                    By:    _____

9                                            William Jennings, Executive Director

10

11 Dated: January *27*, 2020          Elder Creek Transfer & Recovery

12

13                                    By:    _____

14                                            Michael Caprio, Area President

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -

**EXHIBIT A – Facility Site Map**



**Morrison Creek**

**Elder Creek Transfer Station**

Facility Location ● Offsite Water Body ▬

**Elder Creek Transfer Station**

**Facility Location - Figure 1**
**Location:** Elder Creek Transfer & Rec...
**Address:** 8642 Elder Creek Road
Sacramento, California

N

3000 ft
0



MP-3

MP-4

DA-3

DA-4

DA-1

DA-2

MP-1

MP-2

**Elder Creek Transfer Station**

**Stormwater Conveyance - Fig...**
**Location:** Elder Creek Transfer &...
**Address:** 8642 Elder Creek Road
Sacramento, California

N

| | | | |
|---|---|---|---|
| - - - Bioswale | ☐ Buildings | ● Discharge Locations | ┄┄ Drainage Areas |
| ── Fiber Rolls | ➤ Flow Direction | ■ Jensen Precast Clarifier (Sanitary Sewer) | |
| ☐ Site Boundary | ● Stormwater Drain Inlets with Rip-Rap and Fabric Filters | | |
| ➤ Stormwater Pipes | ■ Vortech Stormwater Treatment System | | |

0                    200 ft



MP-3

MP-4

DA-3

DA-4

Scales

Truck Parking

Container Storage

DA-1

White Goods Area

Water

Maintenance

New Oil

Mobile Diesel

Used Oil & Plastic Oil

Shipping and Receiving

DA-2

Bin and Container Storage

Truck Washing Area

Battery and Paint Storage

Green Waste Area

Processed Green Waste

Diesel

MP-1

MP-2

| Buildings | Discharge Locations | Drainage Areas | Offsite Water Body |
|---|---|---|---|
| Paved Areas | Potential Pollutant Sources | Site Boundary | |
| Tank, Aboveground | Vegetation Areas | | |

Elder Creek Transfer Station

**Potential Pollutants - Figure 3**
**Location:** Elder Creek Transfer &...
**Address:** 8642 Elder Creek Road
Sacramento, California

0        200 ft

N



**Elder Creek Transfer Station**

**BMPs - Figure 4**
**Location:** Elder Creek Transfer &...
**Address:** 8642 Elder Creek Road
Sacramento, California

Legend:

- - - Bioswale
— Fiber Rolls
▭ Site Boundary
● Stormwater Drain Inlets with Rip-Rap and Fabric Filters
■ Vortech Stormwater Treatment System
▭ Buildings
▪ Jensen Precast Clarifier (Sanitary Sewer)
✳ Spill Kits
● Discharge Locations
— Offsite Water Body
▶ Stormwater Pipes
▨ Drainage Areas

0       200 ft

**EXHIBIT B – CWA Notice of Violation and Intent to Sue Letter**

Law Offices Of

A N D R E W  L.  P A C K A R D

245 Kentucky Street, Suite B3, Petaluma, CA 94952
Phone (707) 782-4060   Fax (707) 782-4062
Info@PackardLawOffices.com

July 23, 2019

**VIA CERTIFIED MAIL**

William Thomson, Operations Manager
Elder Creek Transfer & Recovery, Inc.
8642 Elder Creek Road
Sacramento, CA 95828

David Burt, Area Environmental Manager
Elder Creek Transfer & Recovery, Inc.
8642 Elder Creek Road
Sacramento, CA 95828

CT Corporation System, Agent for Service
of Process for Elder Creek Transfer &
Recovery Inc.
818 West Seventh Street, Suite 930
Los Angeles, CA 90017

Robert B. Boyer, Chief Executive Officer
Elder Creek Transfer & Recovery, Inc.
18500 North Allied Way
Phoenix, AZ 85054

**Re:  NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE
FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")
(33 U.S.C. §§ 1251 *et seq.*)**

Dear William Thomson, David Burt, and Robert Boyer:

This firm represents California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at Elder Creek Transfer & Recovery Inc.'s facility located at 8642 Elder Creek Road, in Sacramento, California (the "Facility").  This letter is being sent to you as the responsible owners, officers and/or operators of the Facility, or as the registered agent for this entity.  Unless otherwise noted, Elder Creek Transfer & Recovery Inc., William Thomson, David Burt, and Robert Boyer shall hereinafter be collectively referred to as "Elder Creek."  The purpose of this letter is to provide Elder Creek with notice of the violations of the Industrial General Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water associated with industrial activities from the Facility into local surface waters.

Elder Creek is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 14-57-DWQ ("General Permit" or "Permit").[1]  Prior to July 1, 2015, Elder

---

[1] Elder Creek submitted a Notice of Intent ("NOI") to comply with the General Permit for the Facility on or about February 9, 2018, and again on January 24, 2019.  The Facility's Waste Discharge Identification number is 5S34I016593.

Creek's storm water discharges were regulated under Water Quality Order No. 91-13-DWQ, as amended by Water Quality Orders 92-12-DWQ and 97-03-DWQ.

On July 1, 2015, the 2015 General Permit went into effect, superseding the 1997 General Permit that was operative between 1997 and June 30, 2015. The 2015 General Permit includes many of the same fundamental requirements and implements many of the same statutory requirements as the 1997 General Permit. Violation of both the 1997 and 2015 General Permit provisions is enforceable under the law. 2015 General Permit, Finding A.6.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Act subjects Elder Creek to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of up to $37,500 per day per violation for all Clean Water Act violations occurring after January 12, 2009, and $53,484 per day per violation for all violations that occurred after November 2, 2015. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2. As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, CSPA intends to file suit under Section 505(a) of the Act in federal court against Elder Creek for violations of the Clean Water Act and the Permit.

## I.     Background

### A.     California Sportfishing Protection Alliance

CSPA is a non-profit corporation dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters into which Elder Creek discharges polluted storm water. Members of CSPA enjoy the waters that the Facility discharges into, including the Sacramento River. Members of CSPA use and enjoy these waters for their fishing, estuarine habitat and the rare, threatened and endangered species it supports, the wildlife habitat, marine habitat, and other designated beneficial uses. The discharge of pollutants from the Facility impairs each of these uses. Discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Elder Creek' failure to comply with the Clean Water Act and the General Permit.

### B.     The Clean Water Act

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation of a permit, is illegal. *Ecological Rights Found. v. Pacific Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342.

### C.     California's General Permit for Storm Water Discharges Associated with Industrial Activities

Between 1997 and June 30, 2015, the General Permit in effect was Order No. 97-03-DWQ, which CSPA refers to herein as the "1997 General Permit." On April 1, 2014, pursuant to Order No. 2014-0057-DWQ the General Permit was reissued, including many of the same fundamental terms as the prior permit. This permit became effective July 1, 2015. For purposes of this notice letter, CSPA refers to the reissued permit as the "2015 General Permit." Accordingly, Elder Creek is liable for violations of the 1997 General Permit and ongoing violations of the 2015 General Permit, and civil penalties and injunctive relief are available remedies. *See Illinois v. Outboard Marine, Inc.*, 680 F.2d 473, 480-81 (7th Cir. 1982) (relief granted for violations of an expired permit); *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 853-54 (N.D.N.Y. 1984) (holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit); *Pub. Interest Research Group of N.J. v. Carter-Wallace, Inc.*, 684 F. Supp. 115, 121-22 (D.N.J. 1988) ("Limitations of an expired permit, when those limitations have been transferred unchanged to the newly issued permit, may be viewed as currently in effect").

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). 1997 General Permit,

Provision E.1; 2015 General Permit, Standard Condition XXI.A. Facilities must file their NOIs before the initiation of industrial operations. *Id.* Facilities must strictly comply with all of the terms and conditions of the General Permit; a violation of the General Permit is a violation of the CWA.

The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, effluent limitations, and receiving water limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

### D. Elder Creek's Facility

Information available to CSPA indicates that Elder Creek's industrial activities at the approximately 19.26-acre Facility include, but are not limited to: the sorting of municipal solid waste, hauling, cleaning, and maintenance of equipment and machinery, and other activities related to the transfer and recovery processes. The industrial activities at the Facility fall under Standard Industrial Classification ("SIC") Codes 5093 and 4212 ("Scrap and Waste Materials" and "Local Trucking Without Storage," respectively).

Elder Creek collects and discharges storm water associated with industrial activities at the Facility through at least four discharge points into the City of Sacramento storm water drainage system, from which the water ultimately flows into the Sacramento River and the Sacramento-San Joaquin River Delta ("the Delta"). The Delta and is tributaries are waters of the United States within the meaning of the Clean Water Act.

The areas of industrial activity at the Facility are sources of pollutants. The General Permit requires Elder Creek to analyze storm water samples for TSS, pH, and Oil and Grease. 1997 General Permit, Section B.5.c.i; 2015 General Permit, Section XI.B.6. Facilities under SIC Code 5093 must also analyze storm water samples for Iron ("Fe"), Lead ("Pb"), Aluminum ("Al"), Zinc ("Zn") and Chemical Oxygen Demand ("COD"). 1997 General Permit, Tables 1-2; 2015 General Permit, Tables 1-2.

## II. Elder Creek's Violations of the Act and Permit

Based on its review of available public documents, CSPA is informed and believes that Elder Creek is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit. These violations are ongoing and continuous. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Elder Creek is subject to penalties for violations of the Act since May 13, 2014.

**A.** **Elder Creek Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

Elder Creek's storm water sampling results provide conclusive evidence of Elder Creek's failure to comply with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

**1.** **Discharge Prohibitions**

The General Permit prohibits all discharges of storm water associated with industrial activities to waters of the United States except as specifically authorized by the General Permit or another NPDES permit. 2015 General Permit, Section III.A. The General Permit further prohibits the discharge of liquids or materials other than storm water to waters of the United States unless authorized by another NPDES permit. 2015 General Permit, Section III.B.

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. 1997 General Permit, Discharge Prohibition A.2; 2015 General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies. 1997 General Permit, Receiving Water Limitation C.2; 2015 General Permit, Discharge Prohibition III.D.

**2.** **Technology Based Effluent Limitations**

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. 1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals,* 619 F. Supp. 2d 914, 920, 923 (C.D. Cal 2009); 1997 General Permit, Effluent Limitations B.5-6; 2015 General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by Elder Creek: total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; iron – 1.0 mg/L; aluminum

– 0.75 mg/L; zinc – 0.26 mg/L; lead – 0.262 mg/L; chemical oxygen demand – 120 mg/L; and, pH – 6.0-9.0 s.u.

### 3.    Receiving Water Limitations

Storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  1997 General Permit, Receiving Water Limitations C.1, C.2; 2015 General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations.  1997 General Permit, p. VII; 2015 General Permit, Special Condition XX.B.  The documentation must describe changes the discharger will make to its current storm water Best Management Practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Id.

The *Water Quality Control Plan for the Central Valley Region* (Revised April 2016) ("Basin Plan") also sets forth water quality standards and prohibitions applicable to Elder Creek's storm water discharges.  The Basin Plan identifies present and potential beneficial uses for the Sacramento River, which include municipal and domestic water supply, hydropower generation, agricultural supply, industrial service supply, navigation, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, and contact and non-contact water recreation.

### 4.    Elder Creek's Storm Water Sample Results

The following discharges of pollutants from the Facility have violated the discharge prohibitions, effluent limitations, and receiving water limitations of the Permit:

### a.    Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|------|------|------|------|
| 2/25/2019 | SWC | TSS | 320 | 100 |
| 12/24/2018 | SWC | TSS | 400 | 100 |
| 2/26/2018 | SWC | TSS | 260 | 100 |
| 2/26/2018 | NWC | TSS | 120 | 100 |
| 1/5/2018 | SWC | TSS | 340 | 100 |
| 1/5/2018 | NWC | TSS | 230 | 100 |

b. **Discharge of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|
| 2/25/2019 | SWC | Zn | 0.36 | 0.26 |
| 12/24/2018 | SWC | Zn | 0.38 | 0.26 |
| 2/26/2018 | SWC | Zn | 0.38 | 0.26 |
| 1/5/2018 | SWC | Zn | 0.32 | 0.26 |

c. **Discharge of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|
| 3/20/2019 | SWC | Fe | 2.4 | 1.0 |
| 2/25/2019 | SWC | Fe | 9.6 | 1.0 |
| 2/25/2019 | NWC | Fe | 2.2 | 1.0 |
| 12/24/2018 | SWC | Fe | 8.6 | 1.0 |
| 12/24/2018 | NWC | Fe | 3.4 | 1.0 |
| 2/26/2018 | SWC | Fe | 5.1 | 1.0 |
| 2/26/2018 | NWC | Fe | 4.6 | 1.0 |
| 1/5/2018 | SWC | Fe | 7.9 | 1.0 |
| 1/5/2018 | NWC | Fe | 5.2 | 1.0 |
| 2/3/2017 | SEC | Fe | 1.1 | 1.0 |
| 12/15/2016 | NWC | Fe | 1.6 | 1.0 |
| 12/15/2016 | NEC | Fe | 1.2 | 1.0 |
| 10/28/2016 | NEC | Fe | 1.2 | 1.0 |
| 3/11/2016 | NWC | Fe | 1.3 | 1.0 |
| 1/5/2016 | NWC | Fe | 1.1 | 1.0 |

d. **Discharge of Storm Water Containing Aluminum (Al) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|
| 2/25/2019 | SWC | Al | 6.2 | 0.75 |
| 2/25/2019 | NWC | Al | 1.6 | 0.75 |
| 12/24/2018 | SWC | Al | 3.9 | 0.75 |
| 12/24/2018 | NWC | Al | 2.9 | 0.75 |
| 2/26/2018 | SWC | Al | 6.1 | 0.75 |
| 2/26/2018 | NWC | Al | 3.4 | 0.75 |
| 1/5/2018 | SWC | Al | 7.7 | 0.75 |

| 1/5/2018 | NWC | Al | 4.9 | 0.75 |
| 2/3/2017 | SEC | Al | 1.3 | 0.75 |
| 12/15/2016 | NWC | Al | 1.7 | 0.75 |
| 12/15/2016 | NEC | Al | 1.4 | 0.75 |
| 10/28/2016 | NEC | Al | 0.99 | 0.75 |
| 3/11/2016 | NWC | Al | 1.1 | 0.75 |
| 3/11/2016 | SEC | Al | 0.83 | 0.75 |
| 1/5/2016 | SEC | Al | 0.78 | 0.75 |
| 1/5/2016 | NWC | Al | 0.84 | 0.75 |
| 4/7/2015 | NWC | Al | 0.87 | 0.75 |
| 4/7/2015 | NEC | Al | 0.76 | 0.75 |
| 12/3/2014 | NEC | Al | 1 | 0.75 |
| 12/3/2014 | SWC | Al | 1.3 | 0.75 |
| 12/3/2014 | NWC | Al | 0.98 | 0.75 |
| 12/3/2014 | SEC | Al | 1.2 | 0.75 |

**e.** **Discharge of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
| --- | --- | --- | --- | --- |
| 3/20/2019 | SWC | COD | 210 | 120 |
| 2/25/2019 | SWC | COD | 780 | 120 |
| 12/24/2018 | SWC | COD | 990 | 120 |
| 12/24/2018 | NWC | COD | 160 | 120 |
| 2/26/2018 | SWC | COD | 1100 | 120 |
| 2/26/2018 | NWC | COD | 240 | 120 |
| 1/5/2018 | SWC | COD | 710 | 120 |
| 1/5/2018 | NWC | COD | 670 | 120 |
| 10/28/2016 | SEC | COD | 140 | 120 |

**f.** **Discharge of Storm Water Containing Oil & Grease (O&G) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
| --- | --- | --- | --- | --- |
| 1/5/2018 | SWC | O&G | 26 | 15 |

g.    **Discharge of Storm Water Containing Copper (Cu) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark Value (mg/L) |
|------|-----------------|-----------|-----------------------------------|----------------------------|
| 2/25/2019 | SWC | Cu | 0.048 | 0.0332 |
| 1/5/2018 | SWC | Cu | 0.051 | 0.0332 |

h.    **Elder Creek's Sample Results Are Evidence of Violations of the General Permit**

Elder Creek's sample results demonstrate violations of the General Permit's discharge prohibitions, technology based effluent limitations, and receiving water limitations set forth above.  CSPA is informed and believes that Elder Creek has known that its storm water contains pollutants at levels exceeding General Permit standards since at least July 23, 2014.

CSPA alleges that such violations occur each time storm water discharges from the Facility.  Attachment A hereto, sets forth the specific rain dates on which CSPA alleges that Elder Creek has discharged storm water containing impermissible levels of TSS, Fe, Al, COD, Zn, Cu, and O&G in violation of the General Permit.  1997 General Permit, Discharge Prohibition A.2, Receiving Water Limitations C.1 and C.2; 2015 General Permit, Discharge Prohibitions III.C and III.D, Receiving Water Limitations VI.A, VI.B.  Elder Creek may have had other violations that can only be fully identified and documented once discovery and investigation have been completed. Hence, to the extent possible, CSPA includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

**5.    Elder Creek Has Failed to Implement BAT and BCT**

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges.  1997 General Permit, Effluent Limitation B.3; 2015 General Permit, Effluent Limitation V.A.  To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges.  *See* 1997 General Permit, Sections A.8.a-b; 2015 General Permit, Sections X.H.1-2.

Elder Creek has failed to implement the minimum BMPs required by the General Permit, including: good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Permit, Section X.H.1(a-g).  Elder Creek has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with

the General Permit's effluent limitations. 1997 General Permit, Section A.8.b; 2015 General Permit, Sections X.H.2.

Each day that Elder Creek has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Elder Creek has been in violation of the BAT and BCT requirements at the Facility every day since at least July 23, 2014.

### 6.     Elder Creek Has Failed to Implement an Adequate Monitoring Implementation Plan

The General Permit requires dischargers to implement a Monitoring Implementation Plan. 2015 General Permit, Section X.I. As part of their monitoring plan, dischargers must identify all storm water discharge locations. 2015 General Permit, Section X.I.2.a. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events. 2015 General Permit, Section XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3). 2015 General Permit, Section XI.B. Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment. 2015 General Permit, Section XI.B.6. Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event. 2015 General Permit Section XI.B.11.

Elder Creek has failed to develop and implement an adequate Monitoring Implementation Plan. These failures include: using analytical test methods with method detection limits higher than existing approved analytical test methods to analyze samples of storm water; failing to collect samples from all discharge points during each sampling event; and, failing to collect the required number of samples during each reporting period.

Each day that Elder Creek has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit. Elder Creek has been in violation of the Monitoring Implementation Plan requirements every day since at least July 23, 2014.

### 7.     Elder Creek Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan

The General Permit requires dischargers to develop and implement a site-specific SWPPP. 1997 General Permit, Section A.1; 2015 General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site

map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. 2015 General Permit, Section X.B; see also 1997 General permit, Section A.

CSPA's investigation indicates that Elder Creek has been operating with an inadequately developed or implemented SWPPP in violation of General Permit requirements. Elder Creek has further failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's numerous NAL exceedences across multiple pollutant parameters.

Each day Elder Creek failed to develop and implement an adequate SWPPP is a violation of the General Permit. The SWPPP violations described above were at all times in violation of Section A of the 1997 General Permit, and Section X of the 2015 General Permit. Elder Creek has been in violation of these requirements at the Facility every day since at least July 23, 2014.

## 8.      Elder Creek Has Failed to File Timely, True and Correct Reports

Section XVI of the 2015 General Permit requires dischargers to submit an Annual Report by July 15th of each reporting year to the Regional Board. The Annual Report must be signed and certified by a discharger's Legally Responsible Person, or Duly Authorized Representative. 2015 General Permit, Sections XVI.A, XXI.K. The Annual Report must include a compliance checklist, certifying compliance with the General Permit and an explanation of any non-compliance. 2015 General Permit, Section XVI.B.

CSPA's investigations indicate that Elder Creek has submitted incomplete Annual Reports and purported to comply with the Permit despite significant noncompliance at the Facility.

## III.    Persons Responsible for the Violations

CSPA puts Elder Creek on notice that they are the persons and entities responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Elder Creek on formal notice that it intends to include those persons in this action.

## IV.     Name and Address of Noticing Parties

The name, address and telephone number of each of the noticing parties is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainer Avenue
Stockton, CA 95204
(209) 464-5067

## V.     Counsel

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
William N. Carlon
Law Offices Of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

## VI.     Conclusion

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the CWA against Elder Creek and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

_____
Andrew L. Packard
Law Offices of Andrew L. Packard
Counsel for CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## SERVICE LIST

### VIA CERTIFIED MAIL

Andrew Wheeler, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Mike Stoker, Acting Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

William Barr, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Eileen Sobeck, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Patrick Pulupa, Executive Officer
Central Valley Regional Water Quality Control Board
11020 Sun Center Drive, Suite 200
Rancho Cordova, CA 95670

| | | | |
|---|---|---|---|
| 9/25/2014 | 1/17/2016 | 1/3/2017 | 11/9/2017 |
| 10/31/2014 | 1/18/2016 | 1/4/2017 | 11/15/2017 |
| 11/13/2014 | 1/19/2016 | 1/7/2017 | 11/16/2017 |
| 11/20/2014 | 1/22/2016 | 1/8/2017 | 11/17/2017 |
| 11/22/2014 | 1/23/2016 | 1/9/2017 | 11/26/2017 |
| 11/28/2014 | 1/29/2016 | 1/10/2017 | 11/27/2017 |
| 11/29/2014 | 2/17/2016 | 1/11/2017 | 1/3/2018 |
| 11/30/2014 | 2/18/2016 | 1/12/2017 | 1/4/2018 |
| 12/2/2014 | 3/4/2016 | 1/18/2017 | 1/5/2018 |
| 12/3/2014 | 3/5/2016 | 1/19/2017 | 1/8/2018 |
| 12/5/2014 | 3/6/2016 | 1/20/2017 | 1/9/2018 |
| 12/11/2014 | 3/7/2016 | 1/21/2017 | 1/18/2018 |
| 12/12/2014 | 3/10/2016 | 1/22/2017 | 1/22/2018 |
| 12/15/2014 | 3/11/2016 | 2/2/2017 | 1/24/2018 |
| 12/16/2014 | 3/12/2016 | 2/3/2017 | 2/26/2018 |
| 12/19/2014 | 3/13/2016 | 2/5/2017 | 3/1/2018 |
| 2/6/2015 | 3/14/2016 | 2/6/2017 | 3/2/2018 |
| 2/8/2015 | 4/9/2016 | 2/7/2017 | 3/8/2018 |
| 3/11/2015 | 4/10/2016 | 2/8/2017 | 3/13/2018 |
| 4/5/2015 | 4/22/2016 | 2/9/2017 | 3/14/2018 |
| 4/7/2015 | 4/27/2016 | 2/16/2017 | 3/15/2018 |
| 4/24/2015 | 5/5/2016 | 2/17/2017 | 3/16/2018 |
| 4/25/2015 | 5/20/2016 | 2/19/2017 | 3/20/2018 |
| 5/7/2015 | 10/14/2016 | 2/20/2017 | 3/21/2018 |
| 10/17/2015 | 10/15/2016 | 2/21/2017 | 3/22/2018 |
| 11/1/2015 | 10/16/2016 | 3/4/2017 | 4/6/2018 |
| 11/2/2015 | 10/25/2016 | 3/20/2017 | 4/7/2018 |
| 11/8/2015 | 10/27/2016 | 3/21/2017 | 4/16/2018 |
| 11/9/2015 | 10/28/2016 | 3/22/2017 | 5/25/2018 |
| 11/15/2015 | 10/30/2016 | 3/24/2017 | 11/21/2018 |
| 12/3/2015 | 11/19/2016 | 4/6/2017 | 11/22/2018 |
| 12/13/2015 | 11/20/2016 | 4/7/2017 | 11/23/2018 |
| 12/18/2015 | 11/23/2016 | 4/8/2017 | 11/28/2018 |
| 12/19/2015 | 11/26/2016 | 4/12/2017 | 11/29/2018 |
| 12/21/2015 | 11/27/2016 | 4/13/2017 | 12/1/2018 |
| 1/4/2016 | 12/7/2016 | 4/16/2017 | 12/5/2018 |
| 1/5/2016 | 12/8/2016 | 4/17/2017 | 12/16/2018 |
| 1/6/2016 | 12/10/2016 | 4/19/2017 | 12/17/2018 |
| 1/13/2016 | 12/15/2016 | 6/8/2017 | 12/24/2018 |
| 1/15/2016 | 12/23/2016 | 11/4/2017 | 12/25/2018 |
| 1/16/2016 | 1/2/2017 | 11/8/2017 | 1/5/2019 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

| | |
|---|---|
| 1/6/2019 | 2/26/2019 |
| 1/9/2019 | 2/27/2019 |
| 1/15/2019 | 3/2/2019 |
| 1/16/2019 | 3/5/2019 |
| 1/20/2019 | 3/6/2019 |
| 2/1/2019 | 3/19/2019 |
| 2/2/2019 | 3/20/2019 |
| 2/4/2019 | 3/22/2019 |
| 2/8/2019 | 3/23/2019 |
| 2/9/2019 | 3/25/2019 |
| 2/13/2019 | 3/27/2019 |
| 2/14/2019 | 4/2/2019 |
| 2/15/2019 | 4/5/2019 |
| 2/25/2019 | |
| 2/26/2019 | |
| 2/27/2019 | |
| 3/2/2019 | |
| 3/5/2019 | |
| 3/6/2019 | |
| 3/19/2019 | |
| 3/20/2019 | |
| 3/22/2019 | |
| 3/23/2019 | |
| 3/25/2019 | |
| 3/27/2019 | |
| 4/2/2019 | |
| 4/5/2019 | |
| 1/6/2019 | |
| 1/9/2019 | |
| 1/15/2019 | |
| 1/16/2019 | |
| 1/20/2019 | |
| 2/1/2019 | |
| 2/2/2019 | |
| 2/4/2019 | |
| 2/8/2019 | |
| 2/9/2019 | |
| 2/13/2019 | |
| 2/14/2019 | |
| 2/15/2019 | |
| 2/25/2019 | |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**EXHIBIT C -- Map: Surfaces in Drainage Areas 1 and 2 Scheduled for Resurfacing By 10/1/20**



300 ft

**Legend**
CSPA proposes repaving these areas

**Areas to Repave**
Elder Creek Transfer & Recovery

Republic Services Elder Creek Transfer Station

Google Earth

© 2018 Google

**EXHIBIT D**

| Parameter | Value |
|---|---|
| pH (Field test) | 6.0 – 9.0 s.u. |
| Total Suspended Solids | 100 mg/L |
| Oil & Grease | 15 mg/L |
| Iron | 1.0 mg/L |
| Aluminum | 0.75 mg/L |
| Lead | 0.262 mg/L |
| Zinc | 0.26 mg/L |
| Chemical Oxygen Demand | 120 mg/L |
| Copper | 0.0332 mg/L |
| Cadmium | 0.0053 mg/L |
| Nickel | 1.02 mg/L |
| Arsenic | 0.15 mg/L |